## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 11-60380-CIV-ROSENBAUM/SELTZER

DOUGLAS CHRYSTALL, *individually and*
*derivatively on behalf of* SERDEN
TECHNOLOGIES, INC.,

        Plaintiff,

v.

SERDEN TECHNOLOGIES., *et al.*,

        Defendants.

_____/

### ORDER ON DEFENDANTS' MOTIONS TO DISMISS

This matter is before the Court upon Defendants Serden Technologies, Inc.'s and Marc

Duthoit's Motion to Dismiss [D.E. 105] Plaintiff's Second Amended Complaint [D.E. 102] and

Defendant Avitis SAS's Motion to Dismiss Count VI and Motion to Strike Second Amended

Complaint [D.E. 106].  For the reasons provided in this Order, the Court grants in part and denies

in part Defendants' motions.

### I. INTRODUCTION[1]

Plaintiff Douglas Chrystall ("Chrystall") brings this action, individually and derivatively as

a shareholder on behalf of Serden Technologies, Inc. ("Serden").  Serden is a Delaware corporation

engaged in the development of computer software solutions for businesses.  Chrystall, a four-percent

shareholder and one-time board member of Serden, alleges that Defendant Marc Duthoit ("Duthoit")

engaged in wrongful conduct while acting as Serden's Chief Executive Officer, director, and

---

[1] The background of this case has been thoroughly briefed by the parties and recounted in
several orders by the previously assigned judge.  *See, e.g.*, D.E. 1; D.E. 20; D.E. 40; D.E. 66;
D.E. 99.

shareholder, and seeks damages as well as injunctive and declaratory relief.

Defendants Avitis SAS ("Avitis") and Persystent Technology Corporation ("Persystent"), were at one time business partners of Serden. Chrystall's claims arise from two separate transactions involving Defendants: (1) a Settlement Agreement between Serden and Avitis and (2) a Licensing Agreement between Serden and Persystent.

### A. Relevant Factual Background

### 1. The Settlement Agreement with Avitis

On June 6, 2008, Avitis and Serden entered into a Distribution Agreement, through which Avitis became a distributor of Serden's InterAct Software in the Middle Eastern, European (excluding Spain and Portugal), and African markets. D.E. 102, ¶ 20. Shortly thereafter, the business relationship between Serden and Avitis deteriorated, and Avitis brought suit against Serden and Duthoit in the Southern District of Florida.[2] *Id.* ¶¶ 46-75.

In about February 2010, Avitis, Serden, and Duthoit entered into the Settlement Agreement that contained provisions for a technology transfer that resulted in Serden's and Avitis's gaining of equal rights to use the code to the InterAct software; an irrevocable license granted to Avitis to use InterAct and the related source codes; and mutual releases by and between Serden, Avitis, and Duthoit. *Id.* ¶¶ 76-90. Each party represented that it had the legal authority and capacity to enter into the Settlement Agreement. *Id.* ¶ 91. Serden and Avitis subsequently accused each other of violating the Settlement Agreement and agreed to modify it and accelerate its performance. *Id.* ¶ 92.

Chrystall alleges that neither the Settlement Agreement nor the modification were put to a vote by Serden's Board of Directors or presented to Serden's shareholders for approval. *Id.* ¶ 98.

---

[2] *Avitis SAS* v. *Serden Techs., Inc.*, No. 10-cv-60062-ASG (S.D. Fla. Jan. 15, 2010).

He further claims that Duthoit profited at Serden's and its shareholders' expense by using Serden's InterAct software and its source code to obtain a release from the claims against him in his individual capacity.  *Id.* ¶ 99.  As a result of the Settlement Agreement, Chrystall concludes his stock in Serden has been diluted.  *Id.* ¶ 100.

### 2. Chrystall's October 14, 2010 Letter

On October 14, 2010, Chrystall's counsel sent a letter to counsel for Serden and Duthoit that, among other things, suggested that Duthoit acted improperly as Serden's Chief Executive Officer with respect to the Settlement Agreement with Avitis.  *Id.* ¶ 100.  Specifically, the letter asserted that Duthoit had breached his duty of loyalty by obtaining a release of his individual claims using corporate assets; that the terms of the settlement may not be fair to Serden; that by agreeing to the return of unsold licenses, Duthoit wrongfully waived $960,000 of receivables due Serden; and that Duthoit had failed to obtain board or shareholder approval for the settlement.  *Id.* ¶¶ 101-105.  No action was taken in response to the letter.  *Id.* ¶ 106.

### 3. Licensing Agreement with Persystent

On December 15, 2010, Persystent sent a Letter of Intent to Serden offering to purchase Serden's remaining assets, including a customer and prospect list, all of Serden's intellectual property, customer contracts, and any other assets identified during Persystent's due diligence of Serden. *Id.* ¶¶ 114-115.  Chrystall alleges that Persystent offered Duthoit continued employment for Persystent as an incentive for entering into the acquisition.  *Id.* ¶ 121.

On February 28, 2011, Serden and Persystent entered into a Licensing Agreement that superseded the Letter of Intent.  *Id.* ¶ 124.  Under the Licensing Agreement, Persystent did not purchase Serden but instead obtained a perpetual, irrevocable license to use the certain Serden

software products, such as InterActES and GOA Green Power Analyzer, and the related object and source codes, the underlying intellectual property rights, and other related software. *Id.* ¶ 126. Additionally, the Licensing Agreement provided that Serden would supply Persystent with up to thirty (30) days of software training and four months of technical sales and marketing assistance, would transfer to Persystent certain "sales opportunity pipelines" and other sales opportunities, and would support Persystent's efforts to close those potential sale opportunities. *Id.* ¶¶ 127-130. In exchange, Serden received cash and commission bonuses, as well as assurances that Persystent would not recruit Serden employees for a period of one year. *Id.* ¶¶ 131-133. There is no allegation that Duthoit left his employment with Serden or began working for Persystent.

Chrystall alleges that Duthoit entered into the Licensing Agreement on terms unfavorable to Serden, failed to deal fairly with Serden's assets, and failed to obtain a fair price from Persystent. *Id.* ¶¶ 136, 138. Additionally, Chrystall contends that Duthoit is wrongfully using money received under the Licensing Agreement to pay himself and has profited personally at the expense of Serden. *Id.* ¶¶ 136-137, 139.

### B. Procedural History

Since Chrystall filed his original Complaint [D.E. 1] on February 22, 2011, Defendants have filed multiple motions to dismiss, and in response Chrystall has amended his Complaint numerous times. On April 15, 2011, Defendants Duthoit and Serden filed a Motion to Dismiss on jurisdictional grounds under Rule 12(b)(1). This motion also asserted that Chrystall was not an adequate shareholder plaintiff and that he failed to properly plead demand under Rule 23.1. D.E. 20. Defendant Avitis moved to dismiss Count VI of the Complaint, arguing lack of personal jurisdiction and failure to state a claim. D.E. 40. Before the Court ruled on the original dismissal motions,

4

Chrystall sought leave to amend his Complaint.  D.E. 57.

On December 15, 2011, this Court, the previously assigned judge presiding, issued an Omnibus Order Denying Defendants' Motions to Dismiss Complaint and Granting Plaintiff's Motion for Leave to Amend [D.E. 66].  In that Order, the Court held that it had subject-matter jurisdiction over Duthoit and Serden, D.E. 66 at 8,  but that Chrystall had failed to sufficiently plead personal jurisdiction over Avitis, *id.* at 11.  In light of Plaintiff's motion to amend his Complaint, however, the Court deferred ruling on Defendants' Rule 12(b)(6) and Rule 23.1 arguments and dismissed the claim against Avitis without prejudice.  *Id.* at 4, 11.  The Court granted Chrystall permission to amend his Complaint to include, among other things, a sufficient basis for personal jurisdiction over Avitis.  *Id.*  Chrystall filed an Amended Complaint on December 29, 2011.  [D.E. 68].

Serden and Duthoit then filed a Motion to Dismiss the Amended Verified Complaint [D.E. 70], renewing their arguments that Chrystall was an inadequate plaintiff and that he had failed to meet the demand-pleading requirements of Rule 23.1.  D.E. 70-1 at 5, 10.  Duthoit further urged that Chrystall could not maintain Count V of the Amended Complaint, an individual action by Chrystall against Duthoit, because Chrystall had not endured an injury unique from those suffered by shareholders generally.  *Id.* at 17.  Separately, Avitis sought, once again, to dismiss Count VI of the Amended Complaint on the same basis as its prior motion.  D.E. 71.

On May 10, 2012, the Court issued a second Omnibus Order ("Omnibus Order") on Defendants' Motions to Dismiss [D.E. 99].  In the Omnibus Order, the Court concluded that Delaware law applied.  Under Delaware law, the Court held, Chrystall was an adequate shareholder plaintiff, but he failed to plead sufficient facts indicating that he made a proper demand on Serden's board of directors or that such a demand would have been futile.  D.E. 99 at 6-13.  On this basis, the

5

Court dismissed all of Chrystall's derivative claims.  *Id.* at 13, 19.

In the Omnibus Order, the Court also found that Chrystall could not maintain his individual claim against Duthoit because Chrystall did not plead sufficient facts that would have allowed him to demonstrate that his injury was distinct from the injuries suffered by the shareholders of the corporation.  *Id.* at 13-14 (citing *Agostino v. Hicks*, 845 A.2d 1110, 1122 (Del. Ch. 2004)).  Specifically, the previously assigned judge determined that the alleged injury of Chrystall's individual claim—devaluation of stock—is an injury that "affects the shareholders collectively." *Id.* at 14.

Regarding Defendant Avitis, the Court held that its exercise of personal jurisdiction was proper but that, as in the case of Serden and Duthoit, Chrystall had failed to adequately plead demand or demand futility as required by Rule 23.1.  *Id.* at 15-18.  The Court also denied, without prejudice, Avitis's motion to strike certain remedies sought by Chrystall, on the basis that the factual record was not sufficiently developed to support striking the remedies.  *Id.* at 18.

In the conclusion of the Omnibus Order, the Court noted that "[a]ll counts of the Complaint are dismissed without prejudice" on the basis that Chrystall failed to sufficiently plead demand or demand futility.  *Id.* at 19.  Chrystall was permitted to file a Second Amended Complaint.  *Id.* at 20.

Pursuant to the Omnibus Order, Chrystall filed a Second Amended Complaint [D.E. 102]. Defendants Avitis, Serden, and Duthoit once again have moved to dismiss Chrystall's claims.  D.E. 105; D.E. 106.  All Defendants base their current dismissal motions on the argument that Chrystall has still not adequately pled demand or demand futility as required by Rule 23.1.  In addition, Avitis renews its Motion to Strike certain remedies sought by Chrystall.  D.E. 106 at 10.

## II. LEGAL STANDARDS

### A. Applicable Standard on a Motion to Dismiss Under Rule 12(b)(6), Fed. R. Civ. P.

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation").  Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)).  The Supreme Court has emphasized "[t]o survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).

When reviewing a motion to dismiss, a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff.  *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012); *Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002).  Upon engaging in this analysis, a court should deny a motion to dismiss where the pleading asserts non-conclusory, factual allegations, that, if true, would push the claim "across the line from conceivable to plausible."  *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570) (quotation marks omitted); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570) (explaining that allegations in a complaint "must . . . contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'").  A claim is facially plausible when the plaintiff's factual allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

### B. Applicable Standard on a 23.1 Derivative Action

Rule 23.1, Fed. R. Civ. P., applies when a shareholder brings a derivative action to enforce a right that the corporation may properly assert but has failed to do so.  *See Stepak v. Addison*, 20 F.3d 398, 401-02 (11th Cir. 1994).  Rule 23.1 creates a heightened pleading standard, requiring a shareholder's complaint to allege "any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and the reasons for not obtaining the action or not making the effort."  *Id.* at 402; Fed. R. Civ. P. 23.1(b)(3).

As noted above, the Court has previously concluded—and the parties do not dispute—that Delaware law governs their claims, including the extent of the demand requirement.  *See Stepak*, 20 F.3d at 402.  In a derivative action under Delaware law, "[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences."  *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000).

"[T]he right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation."  *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).  When a plaintiff asserts derivative claims regarding multiple transactions, as Chrystall does here, he must plead demand or demand futility as to each transaction.  *See Resnik v. Woertz*, 774 F. Supp. 2d

8

614, 635 (D. Del 2011) (quoting *MCG Capital Corp. v. Maginn*, C.A. No. 4521-CC, 2010 WL 1782271, at * 7 (Del. Ch. May 5, 2010)) ("[E]ach derivative claim for which no demand was made on the board must be evaluated independently to determine whether demand was futile as to that claim.").

### III. DISCUSSION

#### A. Defendants' Rule 23.1 Motions

Defendants argue that this Court should dismiss Chrystall's Second Amended Complaint because he has failed to plead particularized facts demonstrating that he made a demand on Serden's board of directors before bringing his lawsuit or that making such a demand would have been futile. Additionally, Defendants argue that Chrystall's October 2010 letter, whether or not a valid demand, should moot the question of demand futility.

#### 1. Demand or Demand Futility?

First, there appears to be no dispute among the parties that Chrystall's October 14, 2010, letter does not meet the requirements of Delaware law to qualify as a demand on Serden's board for action regarding the Settlement Agreement.  The Court concluded previously that the letter was insufficient because a demand "must be made upon the board of directors or comparable authority," and "making a demand on a president and corporate legal counsel is not sufficient."  D.E. 99 at 11-12 (citing *Shlensky v. Dorsey*, 574 F.2d 131, 140-41 (3d Cir. 1978); *Greenspun v. Del E.Webb Corp.*, 634 F.2d 1204, 1209 (9th Cir. 1980)); *see also Levine v. Smith*, 591 A.2d 194, 205 (Del. 1991), *overruled on other grounds by Brehm*, 746 A.2d at 255.

Although Chrystall's Second Amended Complaint adds more facts about his letter, *see* D.E. 102, ¶¶ 101-105, it does not introduce any new details that would alter the Court's previous analysis

based on the recipients of the letter.  Furthermore, Plaintiff does not press the argument that the letter

represents an adequate demand, and instead now pleads that demand would have been futile with

regard to both the Settlement Agreement and the Licensing Agreement. D.E. 102, ¶¶108-113; 143-

150.  Because Chrystall cannot, and apparently does not, contend that he made a demand, the Court

turns to the issue of whether Plaintiff has sufficiently pled the requirements of demand futility.

### 2. Which Demand Futility Standard Applies?

Delaware law establishes two similar, but not identical, standards to apply regarding demand

futility.  The first, set out in *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), excuses the demand

requirement as futile when the particularized facts alleged in the Complaint create a reasonable doubt

that "(1) the directors are disinterested and independent and (2) the challenged transaction was

otherwise the product of a valid exercise of business judgment."  *Id.* at 814.  The *Aronson* test

applies, however, only when challenging an affirmative action by the board of directors.  *Rales*, 634

A.2d at 933 ("The essential predicate for the *Aronson* test is the fact that a *decision of the board of*

*directors* is being challenged in the derivative suit." (emphasis added)).  Accordingly, when no board

action has occurred, "the appropriate inquiry is whether . . . [the] complaint raises a reasonable doubt

regarding the ability of a majority of the Board to exercise properly its business judgment in a

decision on a demand had one been made at the time [the] action was filed."  *Id.* at 937.

In Chrystall's Second Amended Complaint, he alleges that neither the Settlement Agreement

nor Licensing Agreement was put to a vote by Serden's board of directors or presented to Serden's

shareholders for approval.  D.E. 102, ¶¶ 98, 135.  Defendants argue that because the challenged

transactions were not the product of action by the board of directors, the *Rales* analysis applies.  *See*

D.E. 112 at 5; D.E. 114 at 5.  Chrystall, on the other hand, contends that *Rales* applies only when no

transaction is at issue, apparently suggesting that the involvement of the board of directors is irrelevant. D.E. 108 at 12 n.4. Thus, Chrystall insists, because the transactions themselves can be tested against the business-judgment rule, the *Aronson* test is appropriate. *Id.*

The Court agrees with Defendants that *Rales* governs. The Delaware courts have quite clearly established that the *Rales* test applies instead of *Aronson* when no exercise of business judgment <u>by the board of directors</u> occurs. Indeed, the Delaware Supreme Court specifically contemplated that *Aronson* would be inapplicable "where the subject of the derivative suit is not a business decision of the board." *Rales*, 634 A.2d at 934. Here, Chrystall's Second Amended Complaint alleges that Serden's board of directors never voted to approve the transactions at issue. Therefore, the challenged transactions do not constitute business decisions of the board, and the *Rales* analysis applies.

### 3. Was Demand Futile?

As previously discussed, when bringing a derivative suit challenging a transaction that did not result from a board's business judgment, "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934. In conducting a *Rales* analysis, a court first determines whether any board members are interested or incapable of acting independently. *King v. Baldino*, 648 F. Supp. 2d 609, 617 (D. Del. 2009) (citing *Guttman v. Huang*, 823 A.3d 492, 501-02 (Del. Ch. 2003). If a majority of the board is found to be impartial under this initial analysis, the Court must consider whether this "first-blush veneer of impartiality" is stripped away by well-pled facts of a "non-exculpated claim of breach of

fiduciary duty against a majority of the board." *Id.* If a majority of the board, or one-half in the case of an evenly numbered board, is interested or lacks independence under this analysis, demand will be excused as futile. *Resnik*, 774 F. Supp. 2d at 634 (citing *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1046 n.8 (Del. 2004)).

A director is "interested" for the purposes of the *Rales* analysis where that director "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders" or where "a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Id.* at 936 (citing *Aronson*, 473 A.2d at 812; *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984)). A director is "independent" if that director is capable of making a corporate decision based on the merits rather than extraneous considerations or influences. *Id.* Typically, compensation or benefits do not render a director interested or remove that director's independence unless they are unusually lavish or extreme. *King*, 648 F. Supp. 2d at 618. Further, the fact that directors would be "suing themselves" is generally insufficient, on its own, to demonstrate demand futility. *Id.* at 619-20 (citing *Brehm*, 746 A.2d at 257 n.34). A "mere threat" of personal liability is likewise insufficient to challenge impartiality, but if a director faces a "substantial likelihood" of personal liability for a non-exculpated breach of fiduciary duties, that director's impartiality may be compromised. *Guttman*, 823 A.2d at 501 (discussing *In re Baxter Int'l, Inc. Shareholders Litigation*, 654 A.2d 1268 (Del. Ch. 1995)); *see also Aronson*, 473 A.2d at 815.

**a. Duthoit's Interests**

i. The Avitis Settlement Agreement

Here, Chrystall alleges the following facts, taken as true for purposes of the dismissal

motions, regarding Duthoit's interest in the Settlement Agreement: Duthoit directed a former Serden employee, who was hired by Avitis, to steal trade secrets and confidential information from Avitis. D.E. 102, ¶ 56.  This scheme allowed Serden to collect fees from Avitis while at the same time undermining the parties' distribution agreement by diverting business to a competitor.  *Id.* ¶¶ 58-60. Due to this misconduct, Avitis filed suit against Serden in January 2010 and later amended its complaint to allege claims of fraudulent inducement, misappropriation of trade secrets, and violation of Florida's Deceptive and Unfair Trade Practices Act against Duthoit individually.  *Id.* ¶¶ 73-74.

Shortly after Duthoit was added to the lawsuit, the parties entered into the Settlement Agreement that dismissed Avitis's claims against Serden and Duthoit.  *Id.* ¶ 76.  The Settlement Agreement gave Avitis a "perpetual, irrevocable license" to use Serden's primary asset and major source of revenue—the InterAct software—as well as its source code, underlying intellectual property rights, and trade names.  *Id.* ¶ 82.  Avitis also agreed to pay $250,000 in cash and return unsold InterAct licenses and Avitis's shares of Serden's common stock.  *Id.* ¶ 86.  Duthoit stipulated as part of the Settlement Agreement that the licenses were worth $960,000 and the stock worth $400,000.  *Id.* ¶ 87.

Chrystall contends that Duthoit breached his fiduciary duties by using his position and Serden's assets to secure a release of his individual liability from Avitis, and due to this self-dealing, Duthoit has a disabling financial interest under Delaware law.  On its face, a release from individual civil liability, obtained with corporate assets, seems to be a personal financial interest not shared by the shareholders sufficient to give Duthoit an interest adverse to any lawsuit that sought to overturn the settlement.

Defendants Serden and Duthoit assert, however, that because Duthoit may have been

indemnified under Serden's bylaws as to any liability, should Avitis have prevailed in its lawsuit, any personal interest that Duthoit would otherwise have had in the Settlement Agreement was nullified.   D.E. 105-1 at 11.   Specifically, Serden and Duthoit argue that this potential indemnification is somewhat analogous to the routine director's fees and other benefits that courts have previously held not to create a disabling financial interest.  *Id.*; *see King*, 648 F. Supp. 2d at 618.  Serden and Duthoit add that since board members are "commonly named as defendants" in corporate litigation, "blindly classify[ing] them as 'interested' parties" would make corporate boards powerless to settle litigation. D.E. 105-1 at 12.

The Court, however, is not persuaded by Defendants' arguments.  First, although Defendants make several intriguing points, they cite no case law that supports the contention that potential indemnification mitigates a director's interest.  Further, strictly speaking, the question appears to be whether Duthoit has a financial interest in the disputed transaction—here, the Settlement Agreement—not whether he has a financial interest in indemnification.  *See Rales*, 634 A.2d at 936 ("A director is considered interested where he or she will receive a personal financial benefit from a *transaction* that is not equally shared by the stockholders." (emphasis added)); *Aronson*, 473 A.2d at 812 ("[D]irectors can neither appear on both sides of a *transaction* nor expect to derive any personal benefit from *it* . . . ." (emphasis added)).

Moreover, under Delaware law—and under Serden's bylaws—indemnification is not available when prohibited by Delaware law.  *See* Del. Code Ann. tit. 8, § 145(a) (West 2012) (corporate indemnity available to a qualified person who has "acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation."); *La. Mun. Police Employees Ret. Sys. v. Crawford*, 918 A.2d 1172, 1180 n.8 (Del. Ch. 2007) ("A

14

corporation may only indemnify its own directors to the extent that a director acts in good faith and in the best interests of the corporation and, therefore, may not eliminate or limit the liability of a director who acts in violation of their duty of loyalty.").

Under the facts as alleged in Chrystall's Second Amended Complaint (taken as true for the purposes of this motion only), it seems likely that in stealing Avitis's trade secrets and confidential information and otherwise undermining Serden's Distribution Agreement with Avitis, Duthoit's conduct was in such bad faith or ran so counter to Serden's interests that indemnification would be precluded.  Under these circumstances, the Settlement Agreement confers a personal benefit on Duthoit to the extent that it negates the need for Duthoit to have to take that very real risk. Accordingly, the Court finds that Chrystall has pleaded sufficient facts to establish Duthoit's personal interest in the Settlement Agreement.

ii.  Licensing Agreement

Here, Chrystall alleges the following facts, taken as true for purposes of the dismissal motions, regarding Duthoit's interest in Licensing Agreement.  In December 2010, Persystent submitted a "Letter of Intent" to purchase all remaining assets of Serden.  D.E. 102, ¶ 114.  In the letter, Persystent offered employment to Duthoit, but Chrystall does not disclose the terms of such an offer.  *Id.* ¶¶ 121-122.  On February 28, 2011, Serden and Persystent entered into a Licensing Agreement that resulted in the transfer of software, source codes, and intellectual property rights being transferred to Persystent.  *Id.* ¶ 126.  The Licensing Agreement also provided for sales and technical support and certain limitations on Persystent's solicitation of Serden's employees for employment.  *Id.* ¶¶ 127-133.  Chrystall further asserts that Duthoit is "wrongfully using money received by Serden pursuant to the Licensing Agreement to pay himself" and that Duthoit "has

15

profited and/or will profit at the expense of Serden and Mr. Chrystall." *Id.* ¶¶ 137, 140.

Unlike in the case of the Settlement Agreement, Chrystall has failed to plead with particularity any facts that establish that Duthoit has a personal interest in the Licensing Agreement that would render demand futile. Chrystall makes conclusory allegations that Duthoit is wrongfully paying himself and has profited from the Licensing Agreement. Other than attacking the terms of the agreement as unfavorable, however, Chrystall has not described any self-dealing or bad faith involved in the Licensing Agreement that either gives Duthoit a financial benefit that is not equally shared by the stockholders or demonstrates that a corporate decision to bring suit to abrogate the Licensing Agreement will have a materially detrimental impact on Duthoit as a director.

At most, Chrystall alleges that Persystent offered Duthoit employment in exchange for agreeing to the terms of the intent letter, a proposal that was superseded by the Licensing Agreement. D.E. 102, ¶ 121. Persystent's offer by itself, however, does not suggest any wrongful conduct on Duthoit's part; Chrystall does not allege that Duthoit sought, seeks, or accepted employment with Persystent, nor does he contend that Persystent's offer caused Duthoit to enter into the Licensing Agreement on terms unfavorable to Serden.[3] Although Chrystall would apparently have this Court infer that Persystent's offer in the unconsummated intent letter induced wrongful conduct by Duthoit concerning the Licensing Agreement, *see* D.E. 108 at 18, cursory contentions of wrongdoing cannot substitute for pleading particularized facts. *Guttman*, 823 A.2d at 499. Here, Chrystall has pled

---

[3] Although the Court is aware that in considering the allegations of Chrystall's first Amended Complaint under the business-judgment rule, the prior judge found that Chrystall had alleged that Duthoit entered into the Licensing Agreement in order to obtain employment with Persystent, D.E. 99 at 15, the undersigned respectfully disagrees that the mere allegation that Persystent offered Duthoit employment is sufficient to demonstrate a personal interest on Duthoit's part when no allegations suggest that he ever sought or accepted such employment.

nothing to show that Duthoit accepted or was affected by the offer.  Accordingly, the Court finds that Duthoit does not have a personal interest in the Licensing Agreement.

**b. Independence of the Board**

After analyzing the question of Duthoit's interests, the Court turns to the question of whether any director lacked independence at the time this suit was filed.  *King*, 648 F. Supp. 2d at 617.  A director is "independent" if that director is capable of making a corporate decision based on the merits rather than extraneous considerations or influences.  *Rales*, 634 A.2d at 936.  When a director's livelihood is controlled to such an extent that the director is "beholden" to the target of the lawsuit, that director is generally held to lack independence.  *See, e.g.*, *id.* at 937.

At the time that Chrystall's lawsuit was filed, Serden's board of directors was composed of Duthoit and Eric Eva-Candela ("Eva-Candela").  D.E. 102, ¶¶ 109, 144.  Eva-Candela is also the Chief Technology Officer of Serden.  *Id.*  Chrystall alleges that as CEO and Serden's largest shareholder, Duthoit "dominated" the board of directors.  *Id.* ¶ 148.  Beyond this conclusory allegation, Chrystall never specifically avers that Eva-Candela is so beholden to Duthoit that he lacks independence.  While this Court could assume that a CEO may have some influence over a chief technology officer and the conditions of his employment, Chrystall has once again failed to plead any particularized facts that would support an assumption that such influence exists to such an extent that undermines Eva-Candela's independence or even that it exists at all.

**c. Was Serden's Board Capable of Making an Impartial Decision on Chrystall's Demand?**

Having determined that Duthoit is interested with regard to the Settlement Agreement, it is clear under Delaware law that demand is excused on these claims.  At the time that the Complaint was filed, Duthoit was one half of a two-person board of directors.  D.E. 102, ¶¶ 109, 144.  If one

17

half of an even-numbered board is interested or lacks independence, "there is not a majority of independent directors and demand would be futile." *Beam*, 845 A.2d at 1046 n.8 (citing *Beneville v. York*, 769 A.2d 80, 85-86 (Del. Ch. 2000)).  Thus, Duthoit's disabling interest renders demand futile on the Settlement Agreement claims.

Regarding the Licensing Agreement claims, however, the Court has found that Duthoit is not interested and that Eva-Candela is independent.  Accordingly, demand will be excused only if the Second Amended Complaint "sets forth particularized facts that plead a non-exculpated claim for breach of fiduciary duty" against at least one member of the board.  *See Guttman*, 823 A.2d at 502.

Taking Chrystall's facts as true for the purposes of this analysis, but disregarding his conclusory allegations, the Court finds that Chrystall has not pleaded a non-exculpated claim for breach of fiduciary duties against Duthoit.  According to Chrystall, Duthoit entered into the Licensing Agreement with Persystent in exchange for a paid "purchase price" and other commissions.  D.E. 102, ¶¶ 131-132.  Chrystall alleges that these terms were unfavorable to Serden in that the price was "unfair" and Serden's remaining assets were depleted.  *Id.* ¶¶ 136, 138, 141.  However, Chrystall fails to plead any facts that support his bare conclusion that the price and commissions Serden received under the agreement were "unfair" or that licensing Serden's software in this manner "depleted" Serden's assets.[4]  In the absence of these particularized facts, the Court

---

[4] The Court is aware that Defendants have filed a copy of the Licensing Agreement under seal.  *See* D.E. 47.  However, the Court generally confines its analysis on a motion to dismiss to the complaint and exhibits attached to it.  *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).  In certain situations, a court may look to extraneous documents in considering a motion to dismiss without converting that motion to one for summary judgment if the document is central to the plaintiff's claims and is undisputed.  *Id.*  No party, though, has asked this Court to consider the Licensing Agreement document in reviewing these motions.  And even if the Court did consider the document, the terms of the agreement themselves would not evince unfairness in the absence of particularized facts establishing context.

cannot conclude that Chrystall has established a substantial likelihood of Duthoit's personal liability. Thus, Serden's board of directors would have been capable of impartially responding to a litigation demand made by Chrystall in February 2011.

Accordingly, Chrystall has demonstrated demand futility as it pertains to his claims arising out of the Settlement Agreement with Avitis. Defendants' dismissal motions will be denied as to these counts. But, Chrystall has not established that demand should be excused with regard to the Persystent Licensing Agreement. Therefore, Serden's and Duthoit's motion to dismiss these counts will be granted.

**d. Ancillary Arguments**

Defendants offer several ancillary arguments that should this Court find demand is excused under a *Rales* analysis, the futility of such demand should be disregarded, nonetheless. The Court addresses each argument in turn.

i. Half Is Not a Majority

Defendants Serden and Duthoit concede that while current Delaware law states that when half of an even-numbered board is interested or lacks independence, demand is excused. They suggest, however, that "such precedent, while not yet overruled, is flawed in its construction." D.E. 114 at 10-11. Instead, Defendants appear to favor a rule that would require a majority of the board to be interested or to lack independence. *Id.* at 11 n.7. Since half of a two-person board is not a majority, Defendants reason, demand should not be excused. *Id.*

To the extent that Defendants are inviting this Court to overturn established Delaware state law, the Court declines to do so. It appears to have been a settled question of Delaware law for over twelve years that when half of an evenly numbered board is interested or lacks independence,

demand is excused. *See Benneville*, 769 A.2d at 82 (considering when one member of a two-member board was not impartial). The "*Benneville* rule" has been cited without question repeatedly by Delaware courts, including the Delaware Supreme Court. *See Beam*, 845 A.2d at 1046 n.8. Overturning this settled state law would severely undermine bedrock principles of federal jurisprudence. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 74-78 (1938); *Bailey v. S. Pac. Transp. Co.*, 613 F.2d 1385, 1388 (5th Cir. 1980), *cert. denied*, 449 U.S. 836 (1980) ("[W]here state law has been announced by the state's highest court it is to be followed.").

ii. Delaware's Deadlock Provisions

Defendants Avitis, Serden, and Duthoit make a related argument: that provisions of Delaware law that allow courts to break a deadlocked board of directors would have been available to Chrystall, had he made a demand and Duthoit's vote deadlocked Eva-Candela's. D.E. 105-1 at 13 & n.9; D.E. 112 at 5. Specifically, Defendants cite title 8, section 226 of the Delaware Code, which states in relevant part,

> (a) The Court of Chancery, upon application of any stockholder, may appoint 1 or more persons to be custodians . . . when:
>
> . . . .
>
> (2) The business of the corporation is suffering or is threatened with irreparable injury because the directors are so divided respecting the managment of the affairs of the corporation that the required vote for action by the board of directors cannot be obtained and the stockholders are unable to terminate this division . . . .

*Id.* § 226(a). Under Defendants' theory, Chrystall—realizing that deadlock was inevitible given Duthoit's interest—should have petitioned the Delaware Court of Chancery to appoint a custodian who would have resolved his litigation demand.

20

While Defendants' theory presents an interesting question, the Court disagrees that Chrystall would be required to use section 226(a) to overcome Duthoit's interest.  First, the Delaware statute is permissive; a custodian may be appointed upon application of a stockholder, but nothing in the statute requires the Chancery Court to do so or even obligates a stockholder to make such an application.  *Id.*; *see Hall v. John S. Isaacs & Sons Farms, Inc.*, 146 A.2d 602, 613-14 (Del. Ch. 1958) (construing prior version of statute).

Furthermore, Defendants have cited no cases—and the Court can find none—where section 226(a)(2) was used to overcome a deadlock between partial and impartial directors on a litigation demand.  Accordingly, this Court is not prepared to find that Delaware has carved out of its general law on demand futility an exceptional procedure to be followed only in the event of deadlocked, evenly numbered boards.  Delaware law permits derivative plaintiffs to plead demand futility when half of an evenly numbered board is interested or lacks independence, and this Court cannot agree that section 226(a)(2) requires Chrystall to seek appointment of a custodian instead.

### iii. Does Chrystall's October 2010 Letter Preclude His Pleading Demand Futility?

Defendants raise two related arguments concerning the October 2010 letter sent to counsel for Serden and Duthoit.  First, Defendants appear to contend that because Chrystall previously argued that the letter satisfied the demand requirements of Rule 23.1, he should be estopped from arguing that demand is futile.  D.E. 105-1 at 14-15; D.E. 106, ¶ 18; D.E. 112 at 2; D.E. 114 at 9-10. Serden and Duthoit, in particular, assert that Chrystall alleged that he had made a formal demand in his earlier verified complaint under oath, and, thus, he should not be permitted to "recharacterize" the letter as "informational" in his Second Amended Complaint.  D.E. 105-1 at 14-15.

Contrary to Defendants' arguments, Chrystall never alleged in any of his three verified

complaints that the October 2010 letter represented a demand on the Serden board. *See* D.E. 1; D.E. 68; D.E. 102.  The prior judge agreed, finding, "Chrystall does not allege that he made a formal demand upon the Board of Directors before initiating this action." D.E. 99 at 3.  In each complaint, rather, Chrystall included more details about the October letter, none of which contradict the prior sworn statements. *See* D.E. 1, ¶¶ 80-81; D.E. 68, ¶¶ 101-103; D.E. 102, ¶¶ 101-107.  Thus, any estoppel argument raised on the notion that Chrystall has pleaded inconsistent facts under oath must fail.

Chrystall appears to have contended the letter represented a formal demand in his briefs in opposition to Defendants' first two dismissal motions only.  D.E. 37 at 15; D.E. 75 at 13-14.  The first time that Chrystall argued demand futility regarding the Settlement Agreement occurred in his Second Amended Complaint.  D.E. 102, ¶¶ 108-113.

Rule 8(d), Fed. R. Civ. P., permits parties to state as many separate claims or defenses that the party has, regardless of consistency, subject only to the strictures of Rule 11, Fed. R. Civ. P.  *See Manicini Enters., Inc. v. Am. Express Co.*, 236 F.R.D. 695, 698-99 (S.D. Fla. 2006) (construing former Rule 8(e)(2)).  Defendants suggest that Chrystall's change in course concerning the letter runs afoul of Rule 11, which requires attorneys and parties to certify that factual contentions have evidentiary support.  D.E. 105-1 at 15.

The Court, however, cannot discern how exactly Chrystall has run afoul of Rule 11.  While it is certainly inconsistent to argue that the letter satisfies Rule 23.1's demand requirements, on the one hand, and, on the other, to contend that demand is futile, these are legal theories, not factual allegations, and Rule 8(d) expressly provides for such alternative claims.  Chrystall has pled no facts about the letter that lack evidentiary support.  And although Chrystall's allegations about the content

22

of the letter have grown more detailed, they are not contradictory.  Nor do Chrystall's allegations about demand futility contradict any of the facts that he has pled regarding the letter.  Accordingly, no reason exists to strike Chrystall's demand-futility argument on the basis of inconsistent pleadings.

<u>iv. Does the Letter Represent an Improper Demand That Waives Futility?</u>

Defendants also contend that, although the October 2010 letter is admittedly not an adequate demand, it nonetheless should be treated as an attempted demand on Serden's board by Chrystall. If the letter is an attempted demand, Defendants' assert, it represents evidence that Chrystall thought that he could make a demand and consequently waives his futility argument.  D.E. 105-1 at 14; D.E. 106, ¶ 18.

Defendants are correct that, under Delaware law, once a derivative plaintiff makes a demand on the board of directors, he waives any future arguments that demand was futile.  *Spiegel v. Buntrock*, 571 A.2d 767, 775 (Del. 1990) ("By making a demand, a stockholder tacitly acknowledges the absence of facts to support a finding of futility.").  Defendants cite to a string of cases that all present the same legal rule.  D.E. 105-1 at 12, 14; D.E. 106, ¶ 18; D.E. 114 at 10.  Each of these cases is distinguishable, except for one, on the basis that the plaintiffs made actual, adequate demands on their respective boards.  *See Richelson v. Yost*, 738 F. Supp. 2d 589, 598 (E.D. Pa. 2010) ("Plaintiff's pleading acknowledges making a demand on the board . . . ."); *Quantum Tech. Partners II, L.P. v. Altman Browning & Co.*, No. 08-CV-376-BR, 2008 WL 4525769, at *10 (D. Ore. Oct. 2, 2008) ("Here Quantum alleges it 'demanded that [Apex's BOD] take the action(s) demanded in this Complaint.'"); *Moses ex rel. Gen. Elec. Co. v. Welch*, 638 F. Supp. 215, 221 (D. Conn. 1986) ("The plaintiff made a demand on the GE Board on March 29, 1985); *Allison ex rel. Gen. Motors Corp. v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1117 (D. Del. 1985) ("Application of these guidelines to

the instant demand results in the conclusion that it is more than adequate."); *Spiegel*, 571 A.2d at 774

("Spiegel then filed a demand with the Board . . . ."); *Stotland v. GAF Corp.*, 469 A.2d 421, 421

(Del. 1983) ("[O]ne of the plaintiffs filed a written demand that the GAF board take action . . . .").

Only one case cited by Defendants appears to stand for the proposition that an inadequate

demand will waive a futility argument.  D.E. 114 at 10 (citing *Cordts-Auth v. Crunk, LLC*, 815 F.

Supp. 2d 778 (S.D.N.Y. 2011)).  In *Cordts-Auth*, the court found that the derivative plaintiff had sent

numerous requests demanding information from the defendant but had never demanded that the

defendant take the legal action she asserted in her complaint.  815 F. Supp. 2d at 795-96.

Accordingly, the court concluded that the plaintiff's demand was inadequate under New York

corporate law.  *Id.*

The plaintiff then asserted, for the first time in an opposition brief, that she had sufficiently

pled demand futility because "she made 'repeated demands on Crunk's management,' and Crunk

refused to comply."  *Id.* at 797.  The court held that demand futility did not apply because the

plaintiff did not fail to make a demand, but rather made an inadequate demand.  *Id.*  Moreover, even

if demand futility were applicable, the court determined, the plaintiff could not raise it for the first

time in an opposition brief.  *Id.*  But the court did not expressly hold that under New York law an

inadequate demand waived a contention of demand futility.

Although Defendants' reading of *Cordts-Auth* is plausible, the facts of that case differ

materially from those at issue in this one.  First, procedurally, Chrystall has pled futility in his

Second Amended Complaint, unlike Cordts-Auth, who improperly raised the argument for the first

time in her opposition brief.  Second, substantively, Cordts-Auth's futility argument was based only

the defendant's failure to respond to her (inadequate) demands—a fact that does not appear to fall

into the three limited categories of demand futility under New York law outlined by the court.  *See id.*  Here, however, Chrystall's demand-futility argument relies not on the refusal to respond to his October 2010 letter, but rather on the particularized facts surrounding the Settlement Agreement that establish that Duthoit was an interested director under Delaware law.  Third, *Cordts-Auth* was decided under New York law, whereas Delaware law applies in this case.  Accordingly, the authority cited by Defendants does not support their conclusion that Chrystall's letter represents an attempted demand that would waive his right to argue demand futility.

### C. Chrystall's Individual Claim against Duthoit (Count V)

In addition to his derivative claims, Chrystall also asserts an individual claim against Duthoit for breach of fiduciary duties.  D.E. 102, ¶¶ 186-193.  Chrystall had set forth an identical claim in the previous version of his complaint.  D.E. 68, ¶¶ 171-178.  In her Omnibus Order, the prior judge dismissed this claim because the injuries allegedly incurred by Chrystall individually were no different than those suffered by shareholders generally, so Chrystall's claims were derivative and not individual in nature.  D.E. 99 at 13-14.

In Chrystall's brief in opposition to Serden and Duthoit's Motion to Dismiss, Chrystall contends once again that Delaware law permits him to make an individual claim, implying that the prior judge's analysis was erroneous.  D.E. 108 at 12 n.3.  Serden and Duthoit contend, however, that Chrystall's footnote is a disguised—and improperly argued—motion for reconsideration of the prior judge's order.  D.E. 114 at 3.  Because the earlier order concluded that Chrystall's individual claim was really a derivative claim and then dismissed all the derivative claims without prejudice and with leave to amend, the Court agrees that Chrystall was permitted to amend his complaint to state a claim for individual relief.  The question, therefore, is whether Chrystall has done so.

25

In Count V, Chrystall asserts that Duthoit violated his individual rights as a shareholder by entering into the Settlement Agreement without first obtaining authorization from shareholders as required by Del. Code Ann. tit. 8, §§ 141, 271(a).  D.E. 102, ¶¶ 186-193.  Section 271(a) permits a corporation's board to sell or exchange all, or substantially all, of a corporation's assets, provided that a majority of the stockholders authorized the sale in a resolution adopted at a meeting held after twenty days' notice.  Section 141 establishes, in part, that certain powers and duties must be carried out by a corporation's board.

Distinguishing between individual, or direct, claims and derivative claims can be difficult, and often the same set of facts can give rise to both types of claims.  *See Grimes v. Donald*, 673 A.2d 1207, 1212-13 (Del. 1996), *overruled on other grounds by Brehm*, 746 A.2d at 254.  Delaware law provides a two-part test to aid courts in determining whether a claim is direct or derivative.  *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004).  Under the *Tooley* test, to state a direct claim, the court must look first to the nature of the wrong and determine whether the claimed direct injury is independent of any alleged injury to the corporation.  *Id.* at 1039.  Second, the court must look "to whom the relief should go;" that is, whether the corporation or individual stockholders would receive the benefit of any recovery or other remedy sought by the plaintiff.  *Id* at 1033, 1039.

*Tooley* does not require that a given transaction harm either only the corporation or only the plaintiff.  Rather, if a plaintiff can demonstrate that he or she suffered a harm unique from any harm suffered by the corporation from a given transaction, the plaintiff may proceed on a direct claim.  *See Protas v. Cavanagh*, No. 6555-VCG, 2012 WL 1580969, at *5 (Del. Ch. May 4, 2012).  Accordingly, company-wide monetary harms, such as devaluation of stock or damages resulting from a sale of assets at an unreasonable price, are injuries to the corporation and must be asserted

derivatively.  *See Gentile v. Rossette*, 906 A.2d 91, 99, 102-03 (Del. 2006) (observing that a reduction in assets or their value and diminution of net worth are derivative corporate injuries); *Protas*, 2012 WL 1580969 at *6 (finding depletion of assets harms the corporation directly and stockholders derivatively).  Alleged injuries that can be remedied only by damages that would flow to a subset of stockholders or by injunctive or other equitable relief, however, are properly asserted as direct claims.  *Gentile*, 906 A.2d  at 103 (holding that claim was direct when damages sought could only flow to minority shareholders); *San Antonio Fire & Police Pension Fund v. Bradbury*, No. 4446-VCN, 2010 WL 4273171, at *9 (Del. Ch. Oct. 28, 2010) (request for declaratory relief supported finding claim was direct).  In fact, when considering *Tooley*'s second prong, courts are generally more inclined to permit a direct action when the plaintiff is seeking only injunctive relief.  *See Grayson v. Imagination Station, Inc.*, No. 5051-CC, 2010 WL 3221951, at *6 (Del. Ch. Aug. 16, 2010) (discussing *Grimes*, 673 A.2d at 1213).

Delaware's courts have recognized that Delaware's corporate law establishes certain "structural relationships" between and among a corporation and its officers, directors, and shareholders.  *Grayson*, 2010 WL 3221951 at *5.  If a corporate officer violates these structural relationships between the corporation and the shareholder, the shareholder is independently injured and may assert a direct claim.  *Id.*

Here, taking Chrystall's allegations as true for the purposes of the Motion to Dismiss, the Court concludes that Chrystall has stated an individual, direct claim against Duthoit.  To the extent that Chrystall argues in his footnote that all alleged violations of section 141 give rise to individual claims, the Court does not agree.  *See* D.E. 108 at 12 n.3.  However, the Court must still apply the *Tooley* test to the allegations of Chrystall's Complaint.  Chrystall alleges that the Settlement

Agreement has divested Serden of its primary asset, the InterAct software.  D.E. 102 at 1.  According to Chrystall, Duthoit entered into the Settlement Agreement without obtaining approval of Serden's board and without a stockholder resolution authorizing the sale or exchange of Serden's assets.  D.E. 102, ¶189-190.  Because sections 271(a) and 141 create certain structural rights accruing to shareholders (*i.e.*, the right to authorize an asset sale and the right to have the board approve an asset sale), they can be violated independently of any injury to the corporation.  Thus, if the allegations are true, Duthoit's conduct injured Chrystall's structural rights as a shareholder, and the first prong of *Tooley* is satisfied.

Regarding the second prong, Chrystall appears to seek both injunctive and monetary relief regarding the Settlement Agreement, although he does not plead the relief specifically within Count V.  *See* D.E. 102, ¶¶ 192-193; *id.* at 35-38.  As noted above, claims for injunctive relief tend to suggest that a plaintiff's claim is direct.  Because Chrystall seeks an injunction prohibiting performance of the Settlement Agreement and a declaration that it is invalid, the Court agrees that this is the type of relief that supports a direct claim by Chrystall seeking to remedy the violation of his structural rights.  *See Grayson*, 2010 WL 3221951 at *6; *Grimes*, 673 A.2d at 1213.

But to the extent that Chrystall seeks monetary damages, either from the devaluation of his stock or, for example, from the waiver of $960,000 in receivables, such claims for relief would accrue to the corporation and must be asserted derivatively (and have been asserted by Chrystall's derivative counts).  *See, e.g.*, *Grimes*, 673 A.2d at 1213 (citing *Bennett v. Breuil Petroleum Corp.*, 99 A.2d 236, 241 (Del. Ch. 1953) (noting that a plaintiff proceeded individually on injunctive claims but derivatively on claims that stock was issued for an insufficient price).  Accordingly, insofar as Chrystall seeks injunctive relief regarding the violation of his structural rights as a shareholder, he

has stated an individual, direct claim against Duthoit in Count V.

### D. Avitis's Motion to Strike

Defendant Avitis, which previously moved in response to Chrystall's first Amended Complaint to strike various remedies sought by Chrystall, again seeks that same relief here. *Id.* at 10 n.2. While acknowledging that questions may exist regarding the feasibility of the relief sought by Chrystall, the Court denied Avitis's previous Motion to Strike on the basis that the factual record was incomplete. D.E. 99 at 18-19.

Although Chrystall subsequently amended his Complaint and Defendants have filed new dismissal motions since the previous order, the factual record concerning the feasibility of the relief sought by Chrystall remains in a similarly nascent state. Accordingly, the Court again denies without prejudice Avitis's Motion to Strike, but Avitis may renew its motion when the factual record has been substantially developed.

### E. Further Amendment of Chrystall's Persystent Claims Would Be Futile

Rule 15(a)(2), Fed. R. Civ. P., directs that "[t]he court should freely give leave [to amend pleadings] when justice so requires." Thus, generally, a district court should afford a plaintiff at least one opportunity to amend a complaint in order to correct deficiencies. *Langlois v. Traveler's Ins. Co.*, 401 F. App'x 425, 426 (11th Cir. 2010) (citing *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005)). An exception to this rule exists, however, "(1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001).

Here, Chrystall has been permitted three opportunities to state a valid cause of action

29

regarding the Persystent Licensing Agreement.  *See* D.E. 1; D.E. 68; D.E. 102.  Despite repeated chances to cure these deficiencies, it is clear that Chrystall cannot amend his Complaint to sufficiently plead demand futility regarding the Persystent claims.  Accordingly, allowing further amendment would be futile, and, therefore, the Court grants Defendants' Motion on those claims with prejudice.

## IV. CONCLUSION

For the foregoing reasons, Defendants Serden Technologies, Inc.'s and Marc Duthoit's Motion to Dismiss [D.E. 105] Plaintiff's Second Amended Complaint and Defendant Avitis SAS's Motion to Dismiss Count VI and Motion to Strike Second Amended Complaint [D.E. 106] are **GRANTED IN PART and DENIED IN PART**.

Defendants' motions are **DENIED** as to the claims arising from the Avitis Settlement Agreement, Counts I through VI of Chrystall's Second Amended Complaint.

Defendants' motions are **GRANTED** as to the claims arising from the Persystent Licensing Agreement, Counts VII through XI of Chrystall's Second Amended Complaint.  These Counts are **DISMISSED WITH PREJUDICE**.

Defendant Avitis's Motion to Strike is **DENIED WITHOUT PREJUDICE** and may be renewed when warranted by the factual record in the case.

The parties are directed to confer and submit a new Joint Scheduling Report to the Court no later than January 4, 2013.

**DONE and ORDERED** at Fort Lauderdale, Florida, this 21st day of December 2012.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

30